UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WOODSON,<br><br>Defendant. | Case No. 20-cr-00218-SI-1<br><br>**[SECOND AMENDED] ORDER GRANTING MOTION FOR COMPASSIONATE RELEASE**<br><br>Dkt. No. 30, 37, 40 |

On September 13, 2022, the Court held oral argument on defendant's motion for compassionate release. Dkt. Nos. 30, 37. Having considered the parties' papers and the arguments made during the September 13, 2022 hearing, the Court hereby GRANTS the motion for the reasons articulated below.

**BACKGROUND**

**I.   Mr. Woodson's Childhood and Upbringing**

Born in 1979 in San Francisco, Mr. David Woodson's upbringing was fraught from the start. His father was an abusive alcoholic who beat him when he was a child. PSR ¶¶ 48, 50. Mr. Woodson's parents divorced when he was five years old and he went on to live with his mother, who was addicted to crack cocaine and alcohol. PSR ¶¶ 50–51. Mr. Woodson's life briefly improved when, at eight years old, he moved in with his maternal grandmother where his basic needs were met and he felt truly loved and respected for the first time in his life. PSR ¶ 52. At 12 years old, Mr. Woodson witnessed his grandmother suffer a massive fatal heart attack. Id. With no relatives willing to take him in, and not wanting to return to either of his abusive parents, Mr. Woodson lived transiently – sleeping in cars and spending time in crack dens. *Id.* A year after his grandmother died, Mr. Woodson began using cocaine at age thirteen and dropped out of school by

1  the ninth grade.  PSR ¶¶ 67, 69.

2  By age 21, Mr. Woodson used cocaine daily and would often combine cocaine with ecstasy to stay awake.  *Id*.  Additionally, Mr. Woodson used marijuana, methamphetamine, and opiates regularly.  Dkt. No. 40-1 at 5[1] (Declaration of Todd M. Borden (Borden Decl.) Ex. A (BOP Health Services Screening)).  Throughout his life, while Mr. Woodson abused various substances, he drank socially, but "would not drink to get drunk," and "never wanted to get drunk like his father used to[.]" PSR ¶ 65.

## II. Mr. Woodson's Health History

Now in his forties, Mr. Woodson's addiction to cocaine persists, and the BOP lists "severe stimulant disorder" as one of Mr. Woodson's current health problems.  Dkt. No. 40-2 at 2 (Borden Decl. Ex. B (BOP Health Services List of "Health Problems")).

Mr. Woodson's upbringing and his addictions contributed to various health conditions.  Mr. Woodson struggles with obesity; he is 6'1" and currently weighs 352 pounds with a Body Mass Index (BMI) of 45.8.  Dkt. No. 40-3 at 2 (Borden Decl. Ex. C (5/31/22 BOP Health Services Clinical Encounter Summary)).  Mr. Woodson is currently prescribed daily doses of Carvedilol and Lisinopril to lower his blood pressure and regulate his hypertension.  Dkt. No. 40-4 at 4 (5/27/22 BOP Health Services Clinical Encounter Summary));Dkt. No. 40-2 at 1 (Borden Decl. Ex. B (BOP Health Services List of "Health Problems)).  He has a history of stage three chronic kidney disease dating back to 2015 when his baseline creatine level was its highest at 2.79.  Dkt. No. 40-5 at 7 (Borden Decl. Ex. E (UCSF Medical Notes from September 2019)).  In September 2019, Mr. Woodson received a diagnosis of irregular heart arrhythmia called supraventricular tachycardia (SVT) after experiencing spontaneous episodes of recurring palpitations lasting up to thirty minutes.  *Id*. at 3. In October 2019, after admission to the emergency room, doctors performed an ablation which temporarily stabilized Mr. Woodson's arrhythmia.  Dkt. No. 40-6 ((Borden Decl. Ex. F. (Medical Records from 10/29/19 ER Visit).  However,

---

[1] For ease of reference, page number citations refer to the ECF branded number in the upper right corner of the page.

1    Mr. Woodson's arrhythmia has a strong chance of reoccurring should he use cocaine. Dkt. No. 40-7 at
2    5 (Borden Decl. Ex. G (UCSF Medical Notes from 11/27/19 Visit)).
3        In 2010, Mr. Woodson was also diagnosed with obstructive sleep apnea after participating in a
4    UCSF sleep study. Dkt. No. 40-2 at 2 (Borden Decl. Ex. B (BOP Health Services List of "Health
5    Problems")); Dkt. No. 40-8 at 2-4 (Borden Decl. H (UCSF Medical Notes from September 2010 Sleep
6    Study). Mr. Woodson's sleep apnea causes him to consistently wake up in the middle of the night feeling
7    as if he's choking. Dkt. No. 39 ¶ 8 (Woodson Decl.). Mr. Woodson used cocaine to counteract daytime
8    sleepiness for most of his life. Dkt. No. 22 at 7 (Defendant's Sentencing Memorandum). Mr. Woodson
9    was also being treated by his doctors at UCSF for potential hypersomnia and was scheduled for further
10   evaluation in February 2020. Dkt. No. 40-9 at 2 (Borden Decl. Ex. I (UCSF Medical Notes from
11   12/30/19 Visit)). However, Mr. Woodson was arrested before he could attend the follow up
12   appointment.

### III.    Relevant Criminal History

Mr. Woodson received his first juvenile sentence for burglary in San Francisco at age 15. PSR ¶ 28. Then, at age 19, he was first prosecuted as an adult in San Francisco County for possession of more than 28.5 grams of marijuana and for resisting arrest. PSR ¶ 29.

At 23 years old, Mr. Woodson was convicted of his first federal offense as a felon in possession of a firearm, receiving a 37 month sentence on September 5, 2002. PSR ¶ 31. Less than four months after his release, on September 8, 2004, Mr. Woodson was federally charged with possession with intent to distribute five grams or more of crack cocaine – this would ultimately become his second federal conviction. PSR ¶ 32. Mr. Woodson was sentenced to 96 months which was later reduced to 74 months, based on retroactive changes to the crack cocaine guidelines. *Id*.

Mr. Woodson is currently incarcerated for an incident that took place on February 26, 2020, when San Francisco Police Department (SFPD) responded to a domestic violence incident. PSR ¶ 7. The victim stated Mr. Woodson, who she dated for seven years, had punched her in the face and stolen money and her cell phone. *Id.* The victim did not have visible injuries on her face at the time she was interviewed, and Woodson denies that he hit her. *Id.* The woman directed police to a nearby vacant unit

1  she believed Mr. Woodson was inside. *Id.* ¶ 8. SFPD officers went to the vacant unit and knocked on
2  the door and three individuals, including Mr. Woodson, exited the unit. *Id*. Police arrested Mr. Woodson
3  and his room was identified and searched. *Id*. at ¶¶ 8-9. The search revealed Mr. Woodson's wallet and
4  driver's license and a green camouflaged bag that contained indicia with Mr. Woodson's name (a health
5  benefits form) and suspected marijuana, methamphetamine, black tar heroin, and cocaine. *Id.* ¶¶ 9-10.

6  At the time of the February 26, 2020 incident, Mr. Woodson was on California state parole for
7  a 2014 conviction for Possession of a Controlled Substance for Sale and Criminal Threats and federal
8  supervised release for a December 2005 conviction (his second federal conviction) for violating 21
9  U.S.C. § 841(a)(1), (b)(1)(B)(iii) –Possession with Intent to Distribute and Distribution of 5 Grams or
10 More of Cocaine Base (Case No. CR 04-00359-SI).

11 On August 7, 2020, Mr. Woodson pleaded guilty to violating 21 U.S.C. § 841(a)(1),
12 (b)(1)(B)(viii) –Possession with Intent to Distribute and Distribution of 5 Grams or More of
13 Methamphetamine and the related supervised release violation and was sentenced to 60 months' custody
14 time on the new charge, 21 months on the supervised release violation to run concurrently, and four
15 years' supervised release. Mr. Woodson has approximately 21 months remaining on his prison term –
16 having served nearly two thirds of his sentence – based on a projected release date of June 27, 2024.
17 Dkt. No. 43 at 3 (Opposition).

### IV. Mr. Woodson's Experience Post Conviction in the Instant Action

20 After the undersigned sentenced Mr. Woodson in the instant action, Mr. Woodson was housed
21 at USP Victorville. Dkt. No. 39 at ¶ 2 (Woodson Decl. ISO Mtn. for Compassionate Release). During
22 the nine months Mr. Woodson spent at this facility, he was unable to participate in a Residential Drug
23 Abuse Program ("RDAP") as the facility did not offer such a program. *Id*. ¶ 14; Dkt. No. 37 at 13 (Mtn.
24 for Compassionate Release). Mr. Woodson was then moved to USP Canaan, a United States
25 Penitentiary that does offer RDAP. *Id*. However, before Mr. Woodson could begin RDAP he was
26 moved to USP Beaumont – where he currently is located. Dkt. No. 39 at ¶ 14 (Woodson Decl.). While
27 RDAP is offered at Beaumont, the current wait time to enter the program is a minimum of 9-12 months.

*Id*. Mr. Woodson is on the waitlist but has not yet been admitted into RDAP; as such, he is unable to participate in other anti-recidivism programs available through the First Step Act. *Id*. at ¶ 18.

Further, the entirety of Mr. Woodson's current stay in the BOP has been during the COVID-19 pandemic. *Id*. at ¶ 15. All three BOP facilities Mr. Woodson has been housed in have experienced frequent lockdowns in an effort to curb the spread of the virus. *Id*. Mr. Woodson estimates he has spent 95% of his sentence confined to his cell due to the lockdowns. *Id*. At USP Beaumont, where Mr. Woodson has resided for the past several months, the facility is locked down approximately four days a week and when not in lockdown inmates are only allowed to leave their cells for 2-3 hours in the evening. *Id*. The lockdowns prevent Mr. Woodson from getting a job in the BOP, despite his successful work history during prior sentences. *Id*. at ¶ 16.

Additionally, starting in April 2020 while awaiting adjudication to his current placement at USP Beaumont, Mr. Woodson has not been provided a CPAP machine for his chronic obstructive sleep apnea. *Id*. at ¶¶ 4-7. Despite repeated requests at Santa Rita, Victorville, Canaan, and now Beaumont, the BOP (and Alameda County Jail before that) has yet to provide a CPAP machine. *Id*. Without a CPAP machine, Mr. Woodson struggles to sleep at night, inhibiting his ability to stay awake during the day and, consequentially, his ability to successfully complete the necessary treatment programs should they become available. *Id*. ¶ 8.

## LEGAL STANDARD

Mr. Woodson has filed a motion seeking compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), the First Step Act. In accordance with the First Step Act, a district court may modify a term of imprisonment "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights ... after considering the [applicable] factors set forth in section 3553(a) ... if it finds that ... extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). Congress, however, provided no statutory definition of "extraordinary and compelling reasons." *United States v. Aruda*, 993 F.3d 797, 800 (9th Cir. 2021). Instead, Congress left it to the Sentencing Commission to promulge policy statements regarding what circumstances qualify as extraordinary and compelling. *Id*. The most

applicable policy statement is found in USSG § 1B1.13, which provides that "upon motion from the Director of the Bureau of Prisons," the Court may reduce a term of imprisonment based on defendant's terminal or serious medical conditions, the defendant's age, family circumstances, or "other reasons." USSG § 1B1.13 (Note 1). The policy statement at USSG § 1B1.13 also provides that early release may be warranted so long as "the defendant is not a danger to the safety of any other person or to the community." While USSG § 1B1.13 is not a binding "applicable policy statement" for motions brought by defendants, *Aruda*, 993 F.3d at 802, the policy statement may nonetheless "inform a district court's discretion." *Id*.

As amended by the First Step Act, that statute provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that – (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).[2] The factors within section 3553(a) are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for.

The Ninth Circuit has held "the Sentencing Commission has not yet issued a policy statement 'applicable' to 3582(c)(1)(A) motions filed by a defendant" and "the Sentencing Commission's statements in U.S.S.G. § 1B1.131 may inform a district court's discretion for § 3582(c)(1)(A)

---

[2] Subsection (ii) of the statute provides a separate avenue for sentence reductions for prisoners who are at least 70 years of age and who meet other conditions not applicable here. See 18 U.S.C. § 3582(c)(1)(A)(ii).

6

1  motions filed by a defendant, but they are not binding." *United States v. Aruda*, 993 F.3d 797, 802
2  (9th Cir. 2021) (per curiam). "'[D]istrict courts are empowered . . . to consider any extraordinary
3  and compelling reason for release that a defendant may raise.'" *Id*. at 801 (quoting *United States v.*
4  *McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) (emphasis in original).

## DISCUSSION

It is undisputed Mr. Woodson has exhausted his administrative remedies and the instant motion is properly before the Court. Dkt. No. 43 at 3 (Opposition) ("Because [Mr.] Woodson has exhausted the statutory prerequisites for seeking judicial relief, this Court may consider his motion... [Mr.] Woodson has satisfied the administrative exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A).").

Exercising its discretion with regards to the motion, the Court GRANTS Mr. Woodson's request for compassionate release. Taken together, the circumstances Mr. Woodson faces, as detailed above, amount to extraordinary and compelling reasons for release. First, the BOP has failed to provide Mr. Woodson with important medical care for his pre-existing conditions that place him at a higher risk of becoming severely ill should he contract Covid-19. Mr. Woodson is regularly experiencing a choking sensation when trying to sleep, and his constellation of medical conditions when combined with the high risk of contracting Covid while incarcerated, also amount to extraordinary and compelling reasons for release.

Second, the Court emphasized at the time of sentencing how critically important it was for Mr. Woodson to have access to RDAP – to date he has not received any treatment for his addiction. Other courts have found a defendant's pre-existing medical conditions, combined with BOP's failure to provide addiction support, to constitute extraordinary and compelling reasons to grant a motion for compassionate release. *See, e.g., United States v. Smith*, 2020 WL 4047485, at *5 (W.D. Pa. July 20, 2020) ("the thwarting of his being able to participate in the RDAP program with no indication from the Government that the program will be re-started, [along with other factors] establishe[s] extraordinary and compelling reasons for compassionate release.") (internal quotations omitted); *see also United States v. Weems*, 477 F. Supp. 3d 1301, 1309 (S.D. Fla 2020) (granting

7

1  compassionate release when defendant was near completion of RDAP but was unable to finish due
2  to COVID-related shutdowns of the program); *cf. United States v. Mansourov*, 2021 WL 6063235,
3  at *4 (D. Conn. Dec. 21, 2021) ("without access to rehabilitation services, such as RDAP, it appears
4  that his incarceration is no longer serving one of its intended purposes").

## CONCLUSION

Mr. Woodson's motion for compassionate release is hereby GRANTED. The Court hereby imposes a term of time served as well as four years of supervised release that were previously imposed. Upon Mr. Woodson's release, all previously imposed conditions regarding supervised release will be in effect. The Court orders that upon release, Mr. Woodson will go directly to a half-way house – in Oakland, if at all possible – for up to 180 days.

However, this order shall be stayed until October 17, 2022, subject to (1) the availability of a bed and (2) a concrete transport plan for Mr. Woodson to travel from his current location in Texas to the half-way house in Oakland. The parties shall inform the Court once this plan is in place.

**IT IS SO ORDERED**.

Dated: September 15, 2022

_____
SUSAN ILLSTON
United States District Judge